# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

ANGELA MATHENEY, et al.,

      Plaintiffs,

    v.

STATE OF OREGON, et al.,

      Defendants.

Civ. No. 1:22-cv-01931-AA

**OPINION & ORDER**

_____

AIKEN, District Judge:

This civil rights and tort action arises from the officer-involved shooting death of 37-year-old Isaac Matheney on January 1, 2021. Matheney's estate and family bring claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendment and state law tort claims. Defendants move for summary judgment, contending that, even with the facts viewed in the light most favorable to Plaintiffs, the shooting of Mr. Matheney was reasonable under the circumstances. For the reasons explained, Defendants' motions for summary judgment are GRANTED in part and DENIED in part, consistent with this opinion.

## BACKGROUND

Plaintiffs bring this lawsuit against Oregon State Police ("OSP") Trooper Brennan Pilon ("Pilon") and Sergeant Scott Hill ("Hill"), and Lake County Sheriff's Office ("LCSO") Deputies Dustin Stubbs ("Stubbs"), Vincent Maganzini ("Maganzini"), Michael Patterson ("Patterson"), Craig Kintzley ("Kintzley"), and Undersheriff Paul Havel ("Havel"). The facts are taken from evidence in the record and deposition testimony taken two years after officers shot Mr. Matheney.

I.     Vehicle Pursuit of Mr. Matheney

Emergency dispatch alerted Lake County Sheriff's Department to a 9-1-1 call from a gas station clerk who reported that Mr. Matheney had walked inside the store carrying a rifle, threatened the clerk and demanded money. Galipo Decl., Ex. A, Havel Dep., ECF No. 60-2 ("Havel Dep.") 12:18–13:1.[1] After Mr. Matheney left the store, five officers from the Lake County Sheriff's Office and two officers from the Oregon State Police headed to Highway 31 where Mr. Matheney was likely to be traveling. Mr. Matheney was heading south on Highway 31 and officers pursued him for about two miles before deploying spike strips.  Galipo Decl., Ex. B, Maganzini Dep., ECF No. 60-3 ("Maganzini Dep.") 9:11-18; Havel Dep. 13:16–23, 14:24. Mr. Matheney ran over the spikes and continued driving while Patterson's lights flashed and sirens

---

[1]     Plaintiffs and all Defendants both filed as exhibits nearly identical pages of deposition transcripts from the officers involved. For organizational efficiency, unless noted, the Court cites to Plaintiffs' copies attached to the Galipo Declaration at ECF No. 60 when Defendants have pointed the Court to deposition page number available in Plaintiffs' copies.

blared close behind. Patterson's dashboard camera on his patrol pickup truck shows his pursuit of Mr. Matheney, with a time stamp on the screen. Campbell Decl., Ex. 13, ECF No. 52-3 ("Patterson Dashcam"). Patterson also had a body-worn camera that was activated. *Id.*, Ex. 14, ECF No. 52-4 ("Patterson BWC").

In the video, Patterson is heard saying that Mr. Matheney's "tires are smoking" and that the vehicle was pulling over to the side of the road. Patterson Dashcam 10:43:13. However, Mr. Matheney continued driving. Over the police radio, various officers discussed how to stop Mr. Matheney, when OSP Sergent Hill confirmed that Patterson should use the precision immobilization technique ("PIT") maneuver, saying "go ahead, traffic's blocked, if you can get 'em, get 'em." Patterson BWC 23:51:20.[2]

Eventually, Patterson's truck overtook Mr. Matheney's car, but Mr. Matheney veered away from Patterson, moving left over the center line of the highway, and into the northbound lane. Patterson Dashcam 10:46:00. Patterson again attempted a PIT maneuver, this time forcing Mr. Matheney off the road. *Id.* at 10:46:20.

II.    Officers' Positions at the Scene

Mr. Matheney's car became stuck in the ditch along the north side of Highway 31. He was immediately surrounded from the south by two LCSO deputies, Patterson and Kintzley. To Mr. Matheney's north were OSP troopers Hill and Pilon, who were joined by three LCSO deputies, Stubbs, Havel, and Maganzini. From Patterson's

---

[2]    The Court cites to the video-embedded timestamp in Patterson's body-worn camera, though it does not appear to accurately reflect the true time and date.

dashcam video, the highway appears to run through a rural agricultural area. There was no notable traffic.  Galipo Decl., Exhibit K, ECF No. 60-12 (scene diagram).

As soon as Mr. Matheney's car became disabled in the ditch, Patterson lurched to a stop and jumped out of his truck. With his handgun pointed toward Mr. Matheney, he repeatedly shouted, "Show me your hands, show me your fuckin' hands right now!" *Id*. at 10:46:30. Patterson parked his truck at an angle across the southbound lane, facing south, using the front of his truck as a protective barrier while he faced north toward Mr. Matheney. *Id*. Patterson estimated that he was about 50 yards away from Mr. Matheney's car. Patterson Dep. 16:2–4. He issued several commands to get out of the vehicle. Patterson Dashcam 10:46:55.

Shortly after Patterson stopped his truck, Kintzley rolled up from the north in his patrol truck, ultimately parking at a perpendicular angle to Patterson's truck to block any northbound traffic. Galip Decl., Ex. E., Kintzley Dep., ECF No. 60-6 ("Kintzley Dep.") 14:16–15:9. Kintzley walked toward Patterson, carrying a rifle. Patterson Dashcam 10:46:52. Kintzley moved to a position at the rear passenger side of Patterson's truck, with a view into the windshield and passenger windows of Mr. Matheney's car. *Id*. 17:5–18:5; Ex. I, ECF No. 60-10 (diagram of Patterson's position at the scene).

The remaining five officers parked their patrol cars north of Mr. Matheney, around 70 to 100 yards away. Havel Dep. 15:7–22. All officers at the scene were in positions of cover. *Id*. 31:11–13. Hill stood at the driver side rear bumper of his patrol vehicle, and he used the loudspeaker "to give admonishments" to Mr. Matheney.

Galipo Decl., Ex. G, Hill Dep. ECF No. 60-8 ("Hill Dep.") at 21:12–18. Pilon was on the passenger side of the car, to Hill's right. *Id.*

Havel could not see Hill or Pilon. Havel Dep. 31:20–22. Maganzini was behind Havel, at the passenger side of his own vehicle. Maganzini Dep. 15:18–20. Maganzini could see Havel in front and to his left, and he was "aware" that Stubbs, Hill, and Pilon were also to his left *Id.* As for Stubbs, he could see Hill and Pilon to his left. Stubbs Dep. 29:2–6. Ex. J, ECF No. 60-11 (diagram of north officers' positions). Pilon's dashboard camera and Maganzini's body-worn camera were activated and captured some portions of the incident. Maganzini Dep. 28:12–17; Ex. M, ECF No. 60-14 (Pilon Dashcam Video); Ex. N, ECF No. 60-15 (Maganzini BWC).

III.    Lead-Up to Officer-Involved Shooting

State Police Defendants Hill and Pilon, and County Defendants Stubbs, Havel, and Maganzini fired several rounds at Mr. Matheney. Neither Patterson nor Kintzley fired at Mr. Matheney. The time that elapsed between the moment Patterson exited his truck to issue commands, to the moment officers fired their guns, is less than six minutes. Patterson BWC (23:52:05–23:57:42).

In those six minutes, the Court can identify from the record three notable moments: (1) Mr. Matheney's initial movements inside his car; (2) Mr. Matheney's standing exit from his car to ask for a cigarette and subsequent return to inside his car; and (3) Mr. Matheney's final exit from his car when officers to the north start shooting. Officers to the north engaged in two "volleys" of gunfire. At no point was a

tactical plan discussed among any of the officers. Havel Dep. 65:18–21; Maganzini Dep. 31:24–32:1.

A.    Mr. Matheney's Movements Inside the Car

Patterson, Kintzley, and Hill all issued similar commands to Mr. Matheney to get out of the vehicle and to put his hands up. Patterson Dashcam 10:46:52–10:48:05. Mr. Matheney stepped on the accelerator, but the car was stuck. Debris can be seen flying up from the car as the wheels spin. Patterson BWC 23:53:20–50. Kintzley yelled out "You're not goin' anywhere, get out of the vehicle." *Id*. It is not visible in the video, but during this time, Mr. Matheney partially opened his car door, stuck out his head, and peered around, but did not get out of the car. Patterson Dep. 9:3–6; Galipo Decl., Ex. F., Pilon. Dep., ECF No. 60-7 ("Pilon Dep.") 21:1–6. Before Mr. Matheney closed the door, Patterson heard him ask "why are you fucking with me?" Patterson Dep. 16:18–20.

In his deposition, Kintzley said he remembered seeing that Mr. Matheney's passenger window was down, and from his vantage point, he believed he could see Mr. Matheney go "between the seats to grab the rifle," and bring it "into the front of the vehicle." Kintzley Dep. 18:1–8. After that, Kintzley did not see what Mr. Matheney did with the rifle and never saw him point the rifle at anyone. *Id*. 18:6–12. Patterson is heard saying into his police radio, "He's reaching for something in the back." Patterson BWC 23:54:13–17.

In the north, from Pilon's view at least 70 yards away, Pilon stated in his deposition that he remembered seeing inside the back of Mr. Metheney's car through

the rear window. *Id*. 24:18–21; 26:1–5. Pilon said he could see Mr. Matheney "pull something out," from the backseat that he "thought was like a brown colored stock, which [he] thought was a rifle." *Id*. 24:20–23.

Maganzini heard Patterson communicate over the radio that Mr. Matheney had reached back into his backseat for a gun. Maganzini Dep. 15:3–13. Havel stated that he also heard Patterson say over the police radio that Mr. Matheney was reaching into the backseat for a rifle. Havel Dep. 46:4–11. And, like the others, Stubbs stated that he heard Patterson's radio communication about Mr. Matheney reaching for a gun. Stubbs. Dep. 19:1–3.

In their deposition testimony, every officer at the north side of the scene stated that they heard Patterson say that Mr. Matheney was reaching into the back seat *for a gun*. But video evidence shows that Patterson said he was "reaching for *something* in the back*." Patterson BWC 23:54:13–17 (emphasis added).

B.    Mr. Matheney Exits the Car to Ask for a Cigarette

After a few minutes, Mr. Matheney opened his car door, got out, stood to full height, and raised his hands a little higher than head level with palms opened while facing Patterson. Stubbs Dep. 19:10–17, 21:13–16. Patterson continuously gave Mr. Matheney commands for "hands up" as he exited the car. Patterson BWC at 23:57:10. Officers on the northside of Mr. Matheney could hear Patterson giving those commands. Pilon Dep. 23:21–23; Stubbs Dep. 19:18–20, 23:3–5. Patterson apparently had the best view of Mr. Matheney, and was looking for a weapon, but did not see one. Patterson Dep. 19:24–20:4, 21:12–14; Pilon Dep. 28:19–24.

In Patterson's BWC video, Mr. Matheney can be faintly seen exiting the vehicle and standing upright, with his light-colored sweatshirt visible above the "V" of the driver's door opening. Patterson BWC at 23:57:11–23:57:17. Patterson radioed to the other officers that Mr. Matheney was "getting out." *Id*. Mr. Matheney told Patterson that if he did not get a cigarette, he would shoot himself, and then he got back into the car and closed the door. Patterson BWC 23:57:15–18. Patterson told Mr. Matheney, "Hey, we'll give you a cigarette but put your hands up." *Id*. Then, Patterson relayed to the other officers that Mr. Matheney "said he wants a cigarette, or he's gonna shoot himself." *Id*. 23:57:20–24; Patterson Dep. 21:18–21; Pilon Dep. 24:2–6. Patterson was trying his best to communicate what he was hearing and seeing to the other officers. Patterson Dep. 21:22–25. Once Mr. Matheney's door closed, and he cannot be seen on the video. Patterson BWC 23:57:24.

From the northern vantage point, when Mr. Matheney got out to ask for a cigarette, Havel did not see Mr. Matheney's hands, so Havel explained that did not shoot, because he did not have a reason to believe Mr. Matheney was holding a gun. Havel Dep. 55:7–13. Stubbs also said that, when Mr. Matheney got out of his car, he saw the door open "casually," and Mr. Matheney got out, stood up, and raised his hands. Stubbs Dep. 19:12–14. At that point, Stubbs believed Mr. Matheney was going to comply with the officer's directions and that they would be able to take him into custody. *Id*. 19:14–17.

C.    Officer Shots Fired (Southern Point of View)

Patterson believed that offering the cigarette would be a way to get Mr. Matheney to come out safely. Patterson Dep. 36:7–15. While Mr. Matheney's car door was closed, Patterson called out to him, saying, "Come here and I'll give you one," referring to a cigarette. Patterson BWC 23:57:33.

Immediately after offering the cigarette, Patterson radios to the other officers saying "He—He's got a rifle in his hands." *Id.* 23:57:33–36. Mr. Matheney's car door can be seen open, and Mr. Matheney's white sweatshirt becomes visible at the car door opening. *Id.* 23:57:40–2. Patterson shouts to Mr. Matheney, "Hey—" But he is cut off by the sound of gunfire. *Id.* 23:57:42. Mr. Matheney can no longer be seen at the open car door. *Id.* 23:57:43. Evidence from Patterson's BWC is that Mr. Matheney was seen standing at his open car door for about two seconds when gunfire erupts. *Id.* 23:57:40–42. The sound of gunfire lasted about eight seconds. *Id.* 23:57:43–50. Bullets can be seen striking the field to Patterson's right, beyond Mr. Matheney, with dust flying into the air when each bullet strikes the ground. *Id.* Patterson's Dashcam 10:52:07–15. Patterson took cover, *id.*, and called out "shots fired, shots fired, shorts fired, suspect's down." Patterson BWC 23:57:56–58.

Once Patterson said, "suspect's down," Kintzley walked north up the road to approach Mr. Matheney to render aid. Kintzley Dep. 23:8–12, 23:19–23. While Kintzley was walking along the edge of the road, he believed he was out of the crossfire. *Id.* 24:23–25:4. Kintzley stopped across the road from Mr. Matheney's car. *Id.* 23:8–12. Kintzley heard someone say, "He's still moving," followed by additional gunfire. *Id.* 23:24–24:12. That second round of gunfire started 19 seconds after the

first round of gunfire ended, with the last gunshot heard another 18 seconds later. Patterson Dashcam 10:52:34–52. All gunfire occurred within about 45 seconds. *Id.* 10:52:07–52.

Patterson radioed for medical aid. Patterson BWC 23:58:29. Patterson stated in his deposition testimony that he was "shocked" that the other officers started shooting, because he believed Mr. Matheney was getting out to give up. Patterson Dep. 34:24–35:4. Kintzley was not expecting the second volley of shots. *Id.* 25:5–7.

D.    Officer Gunfire (Southern Point of View)

1.    Oregon State Police: Trooper Pilon

In his deposition testimony, Pilon said he believed his saw Mr. Matheney "crouched in a shooting stance," describing the final time Mr. Matheney exited his car. Pilon Dep. 31:18. Pilon explained, "he was in a low crouched position with his hands forward." *Id.* 30:22–23. When asked about whether he saw Mr. Matheney holding a gun, Pilon said, "I *feel* that he had the rifle in his hands and it was pointed at me, and I was in fear for my life." *Id.* 30:23–25 (emphasis added). Despite repeated questioning, Pilon could not say that he *saw* Mr. Matheney holding a gun. Pilon said he also thought he heard Hill say, "He's got a gun." *Id.* 50:1–5. In engaging in the second round of gunfire, Pilon explained he was primarily concerned for Kintzley, stating he believed that Mr. Matheney could "build a position to shoot underneath the vehicle at Deputy Kintzley" or that Mr. Matheney could be waiting to "ambush" them. *Id.* 51:8–13.

2.    Oregon State Police: Sergeant Hill

In his deposition testimony, Hill stated that his shots were "simultaneous" with Pilon's. Hill Dep. 26:8–25. Hill explained that when he heard Patterson say that Mr. Matheney had a gun, Hill was "fairly certain" he would be shot by Mr. Matheney. *Id*. 27:7–16. When Mr. Matheney opened his car door and stepped out, Hill says that what happened next transpired in "one fluid moment," maybe "a second." *Id*. 28:17–24. Hill believed he saw Mr. Matheney get out of the car, pivot around toward him, squat into a "shooting platform" and aim a black rifle "directly at" him, and that Mr. Matheney's "actions [ ] were a lot faster than [Hill's] reactions." *Id*. 28:1–15. Hill estimated that the time between when the car door opened and his decision to shoot was "like a second," and that "it was as fast as [he] could." *Id*. at 29:3–12. Hill said it "was far too fast to make a command" to Mr. Matheney to drop the gun or put his hands up. *Id*. at 34:1–15.

Hill could not recall how may rounds he fired before Mr. Matheney fell to the ground, but believed it was more than ten rounds. *Id*. 35:1–25. Once Mr. Matheney fell face down, Hill could only see his legs because the rest of his body obscured by "tall brush in the area." *Id*. 36:4–17. Hill did not see any rifle when Mr. Metheney fell to the ground. *Id*. 37:5–6. Later in his deposition, Hill said he "could kind of see his whole body" and that he "watching his entire body and legs," but then again confirmed he only had a visual of his legs. *Id*. 37:7–21. Later on, Hill stated he "wouldn't be able to [see]" Mr. Matheney if Mr. Matheney had tried to get back into his car, "based on the angle and the brush in front of him." *Id*. at 57:21–25.

While Mr. Matheney was on the ground, Hill fired at him again. He said he saw Matheney's legs moving, but that the movement was not what "triggered [Hill] to shoot." *Id*. 38:15–20. What "triggered" Hill to shoot, he explained, was that Mr. Matheney "was still an active threat," since Hill "couldn't see if he still had the rifle." *Id*. 38:15–20. Though Hill never saw Mr. Matheney holding a rifle, Hill stated he "knew he had a rifle" and believed Mr. Matheney would shoot Kintzley with that rifle from his "prone position" under the car. *Id*. 39:10–24. Hill explained that once he saw Kintzley moving, his shots were methodical: "just methodical shots center mass, where I believe center mass was on Mr. Matheney." He continued to fire on Mr. Matheney until he "saw no more movement." *Id*. 38:17–20; 40:20–25.

### 3. County Sheriff's Department: Undersheriff Havel

Havel was also positioned north of Mr. Matheney but could not see Hill or Pilon. Havel Dep. 31:21–22. Hill, Pilon, and Stubbs were at Havel's left, and Maganzini was behind Havel to his right. *Id*. 33:10–16. From Havel's viewpoint, he saw Mr. Matheney get out of the car and stand upright, then go out of view. *Id*. 33:17–21. Havel stated in his deposition testimony that he did not hear any shots until Mr. Matheney was out of his view. *Id*. 33:22–24. Havel never saw a rifle in Mr. Metheney's hands when Mr. Matheney got out of his car. *Id*. 34:5–8. Havel heard multiple shots before he fired his shot. *Id*. 33:1–3. He could not tell where the initial shots were coming from. *Id*. 33:6. Eventually, he realized the sound was coming from his left, where Pilon, Hill, and Stubbs were located. *Id*. 33:7–11. Then, more shots from behind him, where Maganzini was located. *Id*. 33:11–16.

Page 12 – OPINION & ORDER

Havel repositioned, moving toward Pilon's passenger-side door, forward and to the left. *Id*. 38:8–10. He crouched down, and from that view, he saw Mr. Matheney in an area of tall grass in the ditch. *Id*. 38:5–8. Havel described Mr. Matheney to be "laying down" in a "prone position." *Id*. 39:10–15. It was hard to see Mr. Matheney through the grass, and Havel said he "couldn't' positively identify any part of him," or see whether Mr. Matheney had a rifle. *Id*. 41:6–15. When Kintzley moved to render aid, Havel said he "had to assume that [Mr. Matheney was] still a threat," and that he shot at Mr. Matheney "until Deputy Kintzley was in a safe location." *Id*. 43:4–11. Before he started shooting, Havel "couldn't discern any" movements from Mr. Matheney, "other than that there was movement." *Id*.

### 4.    LCSO Deputy Maganzini

Maganzini said that he never saw a rifle in Mr. Metheney's hands and that he did not see Mr. Matheney assume any type of a shooting stance. Maganzini Dep. 16:25–17:6. When Maganzini began shooting, he could not see Mr. Matheney at all, so he was aiming through the back of the car, believing Mr. Matheney was on the other side of the car. *Id*. 17:7–25. Maganzini did not remember how many shots he fired but footage showed he fired between 10 and 15 shots. *Id*. 29:18–20. He stopped firing when he heard someone say that Mr. Matheney was down. *Id*. 19:3–13. Afterward, however, he heard additional shots and did not know why others were still shooting. *Id*. 37:3–6.

5.    LCSO Deputy Stubbs

In his deposition, Stubbs said he aimed at Mr. Matheney's torso when he got out of the car the final time, because Mr. Matheney was moving toward him in an "aggressive manner." *Id*. 27:16–24. Stubbs did not see a rifle in Mr. Matheney's hands. *Id*. at 27:13–15. Stubbs "began firing when [he] had a target" and he believed that firing was appropriate "just due to the nature of the [9-1-1] call and with [Mr. Matheney's] demeanor and the fact that he was reported to have a rifle in his hands." *Id*. 28:1–6. When asked by Plaintiffs' counsel whether he heard two shots from his left before he fired his shots, Stubbs responded that it was "almost simultaneously" with his shot and that he "had already made the decision to fire." *Id*. 28:18–24. Stubbs shot Mr. Matheney within "a second" of him getting out of his car. *Id*. 29:15–18. As he reiterated in his deposition, from Stubb's perspective, Mr. Matheney was "on his way out of the vehicle" when Stubbs "fired [his] first shot." *Id*. 30:1–4. No commands were given when Mr. Matheney got out of his car. *Id*. 29:19–25. Stubbs did not warn that he was going to use deadly force. *Id*.

Stubbs agreed that, before firing six or seven shots, he did not try to ascertain whether Mr. Matheney had a weapon, and that he fired "due to the repitity [sic] of the incident and his behavior on exiting the vehicle." 32:1–8. Stubbs "believed that a weapon was in [Mr. Matheney's] hands, and his intent was to use that weapon against us." *Id*. In Stubbs' initial interview one week after the incident, he could not say that he saw a weapon. *Id*. 33:1–25.

After Mr. Matheney fell to the ground and Kintzley moved in to render aid, Stubbs stated that he could not recall whether he saw Mr. Matheney on the ground. *Id*. 39:13. Regardless, Stubbs agreed that he tried to hit Mr. Matheney's "center mass" when he fired two more shots after Mr. Matheney fell. *Id*. 39:1–3.

IV.    Post-Shooting Observations

Though Mr. Matheney had been shot several times and was not moving, the officers determined that they needed an armored vehicle to approach him. Patterson estimated that there were approximately 15 to 30 minutes after the shooting before the armored vehicle arrived. Patterson Dep. 37:24–38:7. Pilon explained that it "felt like forever" before the armored vehicle came, and he estimated it to be about an hour after the shooting. Pilon Dep. 52:1–10. When Havel approached Mr. Matheney in the armored vehicle, he saw no rifle on the ground with Mr. Matheney. Havel Dep. 52:13–17. Havel recalls seeing the rifle in the front seat of Mr. Matheney's car, barrel up, with the butt of the gun down by the brake pedal. *Id*. 52:18–25. Maganzini stated that, at no time before or after the shooting did he see a rifle. Maganzini Dep. 25:11–20. Maganzini was one of the first to approach the scene after the shooting and saw that there was no rifle on the ground or near Mr. Matheney's reach. *Id*. 25:17–25.

Evidence in the record is that there was no rifle or weapon on the ground outside of the vehicle or near Mr. Matheney. Galipo Decl., Ex. O, ECF No. 16 (photos of Mr. Matheney's final resting position). No officer saw Mr. Matheney get back into the car at any time during or after the officers fired at him Havel Dep. 50:7–14; Maganzini Dep. 27:2–4; Stubbs Dep. 43:14; Patterson Dep. 43:8-18; Hill Dep. 57:21–

58:6. He was never seen putting the rifle back into the car after he was shot. Stubbs Dep. 44:5–7. It was later determined that the rifle was not a real gun. Kintzley Dep. 26:24–27:9, 27:7–12.

V.    Physical Evidence of Bodily Harm and Bullet Trajectory

Evidence in the record is that Mr. Matheney sustained 14 gunshot wounds to his body. *See* Galipo Decl., Ex. R, ECF No. 19 (autopsy). He sustained one gunshot wound to his head, (Wound #1) entering the left posterior parietal scalp area (left backside of the head) and exiting in the mid frontal bone area (Wound #11). *Id*. at 3, 4, 5. Wounds #2 and #3 are shrapnel injuries. The trajectory of the head wound is back to front, left to center, and mostly level. *Id*. at 4, 5. This bullet wound did severe damage to the skull and brain. *Id*. at 4.

Gunshot wounds #4 and #5 entered Matheney's left upper back and caused severe damage to his left scapula and shoulder joint. *Id*. at 5. Wound #6 entered the right mid-back and injured Matheney's ribs and organs. *Id*. at 4–5. Wound #7 entered along the left back side of the chest had a back to front and level trajectory. *Id*. at 3, 4. It fractured Matheney's left 7th, 8th, and 9th ribs. *Id*. Wound #8 entered Matheney's right lower back. *Id*. at 3. Wound #9 entered Matheney's right back side of the chest. *Id*. at 3–4. Wound #10 is an exit wound. *Id*. Wound #12 had a back to front, center to right, and downward trajectory, with the bullet being recovered in the lower right abdominal wall. *Id*. at 5. Wound #13 entered the center of Matheney's right knee. *Id*. at 4.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Id.* But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth

specific facts showing that there is some genuine issue for trial to defeat the motion. *See* FED. R. CIV. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

## CLAIMS UNDER 42 U.S.C. § 1983

"To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). With limited exceptions, the Eleventh Amendment bars from suit under § 1983 a state, its agencies, and officials acting in their "official capacity." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Claims seeking monetary damages may only be brought against a state official sued in his or her "individual capacity." *Suever v. Connell*, 579 F.3d 1047, 1060–61 (9th Cir. 2009); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). For these personal-capacity claims, Eleventh Amendment immunity issues are not implicated because the claim is against the individual and not the state. *Suever*, 579 F.3d at 1060. To establish personal liability for damages under § 1983, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *Id.*

The judicially developed doctrine of qualified immunity limits individual liability in § 1983 actions and demands that the allegedly violated law be "clearly established" so that it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah*, 142 S. Ct. at 11 (quoting *Wesby*, 138 S. Ct. at 590). The Supreme Court "has recognized that '[i]t is

sometimes difficult for an officer to determine how the relevant legal doctrine ... will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Thus, the key question is "whether the violative nature of particular conduct is clearly established." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). Liability requires at least enough individual involvement from each defendant to put him on notice that his conduct might reasonably lead to a constitutional violation. *Id.*

## DISCUSSION

I.    Preliminary Rulings

A.    Evidentiary Objections

Plaintiffs object to some of Defendant Kintzley's exhibits. Plf. Br. at 15 (listing Exhibits 1, 2, 3, 4, and 5, which contain witness interviews taken after the shooting). The Court declines to strike the evidence at this juncture but determines that the challenged exhibits are not relevant to its consideration in ruling on Defendants' motions for summary judgment. In an excessive force case, the Court views "the facts in the light most favorable to the nonmovant, but [is] 'limited to considering what facts the officer[s] could have known at the time of the incident.'" *Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 815–16 (9th Cir. 2023) (quoting *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017)) (second alteration in original). Therefore, the Court does not consider the challenged exhibits in reaching its decision.

B.    Plaintiffs' Conceded Claims

In their response, Plaintiffs concede the following claims: (1) Fourth Amendment Denial of Medical Care, Sec. Am. Compl ("Compl.") at 10; (2) Municipal Liability—Ratification, *id*. at 16; (3) Municipal Liability—Failure to Train, *id*. at 18; (4) Municipal Liability—Unconstitutional Custom of Policy, *id*. at 21; and (5) state-law Battery Claim as to Kintzley and Patterson, *id*., at 25. Accordingly, to the extent Defendants moved for summary judgment against those claims, Defendants' motions are GRANTED. The remaining claims are for Excessive Force, Substantive Due Process, Negligence/Wrongful Death under Oregon law, and Battery under Oregon law against the officers who shot Mr. Matheney.

C.    State Defendants' Failure to Address Claims and Defenses

State Defendants did not provide any argument about (1) qualified immunity; (2) Plaintiffs' Fourteenth Amendment claim; or (3) Plaintiffs' "integral participant/failure to intervene" theory under the Fourth Amendment. State Defendants have not met their initial burden of showing they are entitled to summary judgment on those claims or on the defense of qualified immunity. *Celotex*, 477 U.S. at 323 (moving party bears initial burden of informing the Court of the basis for its motion and identifying pleadings and discovery that demonstrate the absence of a genuine issue of material fact for trial). Also, State Defendants' brief includes factual omissions that misrepresent evidence in the record.

II.    Excessive Force—Fourth Amendment (42 U.S.C. § 1983)

In their first claim for relief, Plaintiffs allege under § 1983 that Defendants' unjustified use of force deprived Mr. Matheney of his Fourth Amendment right to be

secure against unreasonable searches and seizures. Compl. ¶¶ 40–46. Plaintiffs also allege that all Defendants are liable for Mr. Matheney's injuries, either because they were "integral participants in the use of excessive force, and/or because they failed to intervene to prevent these violations." *Id*. ¶¶ 45. All Defendants move for summary judgment on Plaintiffs' claim of excessive force. ECF Nos. 50, 53, 55.

A.    Excessive Force Legal Framework

A decedent's estate may bring a survivor action under § 1983 to vindicate the decedent's right to be free from excessive force. *Chaudhry v. City of Los Angeles,* 751 F.3d 1096, 1103 (9th Cir. 2014). Excessive force claims are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citation omitted). To determine the reasonableness of an officer's actions, the court must "balance[s] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

The government's interest is evaluated under "the totality of the circumstances," *id.* at 9, examining factors such as (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest

by flight. *Graham*, 490 U.S. at 396. The "most important" of these factors is "whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc)).

Additional factors to consider are the availability of alternative methods to effectuate an arrest or overcome resistance. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1137, 1138 (9th Cir. 2019). Deadly force has been determined to be permissible only "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11.

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. County of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted). The Ninth Circuit has cautioned that excessive force cases pose "a particularly difficult problem" where cases involve the suspect's death, because "the witness most likely to contradict [an officer's] story" is not available to testify. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (citations omitted). In such cases, the evidence should be carefully examined "to determine

whether the officer's story is internally consistent and consistent with other known facts." *Id.* at 794–95.

B.    Excessive Force Analysis

Kintzley asserts that his gun malfunctioned, so he could not shoot at Mr. Matheney, therefore he can only be held liable if he was an "integral participant" in the alleged constitutional violation. Def. Kintzley Mot. Summ. J. ("Kintzley Br.") at 10, ECF No. 50. The Court agrees that because Kintzley did not fire shots at Mr. Matheney, his claim is best evaluated in a separate section below.

Patterson asserts that he did not use "any force" against Mr. Matheney and thus cannot be held liable under any theory of excessive force. Lake County Defendant's Mot. Summ. J. ("County Br.") at 18. As with Kintzley, the Court will address whether Patterson was an "integral participant" in a separate section below.

The remaining Lake County Defendants assert that their knowledge at the scene reasonably led to their conclusion that deadly force was warranted, given their awareness that Mr. Matheney had a rifle in the car; had previously shown the rifle at a convenience store in a threatening manner; and had a "[d]esperation and an unyielding desire to get away at all costs," demonstrated by his evasion and failure to stop the car. County Br. at 8.

State Defendants assert that Mr. Matheney pointed a firearm "directly at the officers," and that it is therefore "indisputable that he posed an immediate deadly threat" to them, warranting lethal force. State Def. Mot. Summ. J. ("State Br.") at 8–9. State Defendants also assert that Mr. Matheney had "committed multiple felonies

at the time of the shooting," and had tried to evade arrest. *Id*. at 9–10. Further, there were no reasonable alternatives to using lethal force, because the "events unfolded in seconds." *Id*. at 11.

Accordingly, the Court addresses those arguments and examines the above-described government interest factors from *Graham*. In doing so, the Court does not weigh evidence to determine the truth about what happened. FED. R. CIV. P. 56; *Anderson,* 477 U.S. at 249. Rather, the Court decides as a matter of law whether Defendants have demonstrated that there is no dispute of fact that deadly force against Mr. Matheney was reasonable "under the totality of the circumstances." *Garner*, 471 U.S. at 8.

### 1.    Severity of the Intrusion

Deadly force was used in this case. The severity of that force is "unmatched," and the officers involved deprived Mr. Matheney of the "fundamental interest in his own life." *Graham*, 490 U.S. at 396. The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force. *Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 821 (9th Cir. 2023).

### 2.    Government Interest Factors

#### i.    Severity of the Crime

Noted above, leading up to the shooting, State and County Defendants assert that they had information that Mr. Matheney was involved in a robbery with a firearm, and that this awareness was relevant to their interest in apprehending Mr. Matheney and justifying use of deadly force. State Br. at 9; County Br. at 8. The Court

agrees with Defendants that this information provides contextual background as to what Defendants reasonably believed about Mr. Matheney as they pursued him.

Plaintiffs respond, however, that no officer involved had any information whether Mr. Matheney fired the weapon or caused bodily harm to anyone during the alleged robbery, and even if he had, his reported robbery was over and done when the involved Defendants used deadly force, rendering such force unconstitutional. Plf. Br. at 16.

State Defendants maintain that its officers knew Mr. Matheney had committed "multiple felonies" justifying the use of deadly force—"multiple felonies" referring to Mr. Matheney's conduct leading up to the shooting, including his failure to pull over and follow verbal commands. State Br. at 9. State Defendants point to authority that, where an "officer reasonably conclude[s] that a burglary might be in progress," use of force is justified, because a burglary is "dangerous" and "can end in confrontation leading to violence." *Id.* (citing *Lowry v. City of San Diego,* 858 F.3d 1248, 1257 (9th Cir. 2017)).

On review, *Lowrey* is not so applicable here, when each Defendant knew that Mr. Matheney was no longer burglarizing anyone when they shot him. Nor is *Lowrey* as applicable when non-lethal force—the spike strips and a PIT maneuver—had successfully brought the vehicle pursuit to an end along a remote highway, leaving Mr. Matheney stuck in a ditch, confused and asking for a cigarette. *See* Patterson Dep. 16:18–20 (Mr. Matheney asking, "why are you fucking with me?") Patterson BWC 23:57:15–18 (Mr. Matheney asking officers for a cigarette).

Page 25 – OPINION & ORDER

The circumstances here—where Mr. Matheney's attempted robbery had ended—are different from those circumstances more immanent in *Lowrey*—where the defendant was in the midst of committing his burglary when officers used lethal force. State Defendants are correct that the Ninth Circuit has used "severity of the crime" as a "proxy-for-danger" to justify use of lethal force. *Lowry,* 858 F.3d at 1257. But the Ninth Circuit has clarified that "this severity-of-crime as proxy-for-danger approach" has little applicability in a case like Mr. Matheney's, when the suspect's "felonious threats" occurred *before* officers arrived, and when the suspect is no longer engaged in the felonious conduct when officers fire their weapons. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019). As a matter of law, a jury could conclude that the "severity" of Mr. Matheney's crimes, even if accurately characterized as a felony, did not render the use of deadly force objectively reasonable. *Id*. Accordingly, based on the evidence in the record, the "severity of the crime" is not a factor weighing heavily on the side of government interest here.

> ii.    Immediate Threat of Death or Serious Bodily Injury

The most important question in this case is whether Defendants reasonably perceived Mr. Matheney as immediate threat—i.e., whether Mr. Matheney posed a significant threat of serious physical injury to the officers or others. *City of Hemet*, 394 F.3d at 702; *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014).

State and County Defendants assert that Mr. Matheney posed an immediate threat to the officers involved. State Br. at 8–9; County Br. at 8. Those Defendants point to evidence of their knowledge at the scene about Mr. Matheney's reported

armed robbery; of the car chase leading to deployment of spike strips and a PIT maneuver; that he had reached into the backseat of his car; and that Patterson had radioed that Mr. Matheney had a "rifle in his hands." *Id.*

Based on that evidence, State Defendants assert their reasonable belief that Mr. Matheney had a "high-powered firearm and pointed it directly at the officers," maintaining that it is "undisputable that he posed an immediate danger to the Troopers from their perspective." State Br. at 9. County Defendants assert that, in combination with evidence leading up to the shooting, Mr. Matheney "exited the vehicle with an aggressive stance toward officers and troopers to the north which resulted in the drawn fire." County Br. at 8.

Plaintiffs respond by pointing to evidence in the record about: Mr. Matheney exiting the vehicle, standing upright and facing Patterson when he exited the second time; Patterson's BWC video showing Mr. Matheney over the "V" of the driver's door when he exited prior to the shots; Mr. Matheney asking Patterson for a cigarette just before officers fired; the gunshot wounds to the back—rather than the front—of Mr. Matheney's body; the back-to-front, level bullet trajectories that contradict testimony that he was in a low "crouching" stance; and the rifle being found in the car after the shooting without any blood on it. Plf. Br. at 18–21.

From that evidence, Plaintiffs assert that "a reasonable jury could find that [Mr.] Matheney was unarmed when he exited the vehicle the second time and that he was shot in the back almost immediately after he exited the vehicle by the officers to the north—before he ever turned towards them." *Id.*

From the evidence, the officers' combination of facts would seem physically impossible and irreconcilable with the totality of the evidentiary record. Some of Defendants' testimony contradicts their arguments that Mr. Matheney posed a threat. *See e.g.* Pilon Dep. 30:23–25 (conceding that he did not see a rifle in Mr. Matheney's hands, but that he could "*feel* that he had the rifle in his hands[,] and it was pointed at me, and I was in fear for my life.") (emphasis added).

Plaintiffs point to physical evidence, such as the fact that the gun was not found on the ground with Mr. Matheney, but in his car. And that the bullet trajectory into Mr. Matheney's body, in most instances, was back to front, which Plaintiffs assert could indicate Mr. Matheney was shot while facing away from officers in the north. This, in addition to footage from Patterson's BWC when Mr. Matheney is *not* in a "low crouching position," "shooting stance," or "aggressive[ly]" moving north, but rather, is standing and in the middle of a conversation with Patterson, when rapid gunfire begins. *Compare* State Def. Br. at 5 (citing deposition testimony describing crouching, shooting stance, and aggressive movement), *with* Patterson BWC 23:57:38–42 (showing Mr. Matheney standing while Patterson converses with him).

The Ninth Circuit has stated that courts must examine all the evidence in the record, such as medical reports and physical and circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); State Br. at 12.

The factual dispute over whether officers reasonably believed Mr. Matheney posed a direct threat is only heightened by evidence that Patterson called out that Mr. Matheney had a rifle in his hands, while several Defendants noted their observation, after the shooting, that the rifle was still in the car. And, while State Defendants Pilon and Hill are adamant that Mr. Matheney pointed a rifle at them, County Defendants, Havel, Maganzini, and Stubbs, who also shot Mr. Matheney, never saw a rifle in Mr. Matheney's hands. Havel Dep. 31:8–13, 34:5–8; Maganzini Dep. 16:26-17:6; Stubbs Dep. 27:13-15.

The evidence raises material questions of fact about the reasonableness of the officers' actions, in addition to the credibility of post-hoc justification of conduct. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 706 (9th Cir. 2017) (stating that conflict between evidence of officer's recollection of event and evidence from "imperfect" video footage demonstrates "existence of a genuine dispute of material fact.").

From the evidence in the record, viewed in the light most favorable to Plaintiffs, a reasonable juror could conclude that State Defendants were not reasonable when they perceived a weapon in Mr. Matheney's hands. And equally, that County Defendants were not reasonable in their use of force when they did not see a weapon in Mr. Matheney's hands. This is consistent with the Court's duty to review the record "from the perspective of a *reasonable* officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (emphasis added). Accordingly, this factor is of neutral weight, because there is as much evidence in favor of the conclusion that Mr. Matheney was not a direct threat as there is evidence

that he was, and therefore, whether Defendants were objectively reasonable in using deadly force is a matter inappropriate for resolution at the summary judgment stage and is a matter for the jury to resolve. *Liston,* 120 F.3d at 976 n.10.

### iii.    Resistance (or Evasion of Arrest by Flight)

As noted above, video evidence shows that Mr. Matheney did not pull over, despite being pursued by Patterson, who had his sirens on and patrol lights flashing. That fact weighs in favor of Defendants' governmental interest in use of force. However, it is counterbalanced by other evidence, namely, that Patterson had immobilized Mr. Matheney's car. Discussed above, when he was stuck in the ditch, Mr. Matheney stepped on the gas pedal, and all Defendants observed the stripped-to-the-rim tires flinging debris in the air. It was objectively apparent, as both Kintzley and Patterson observed at the scene, that Mr. Matheney "wasn't goin' anywhere." Patterson BWC 23:53:20–50; Pilon Dep. 22:6–13.

From that point on, factual disputes—material to resolution of this case—remain. It is contested whether Mr. Matheney was resisting or complying with orders in the minutes leading up to his death, and the evidence in the record is conflicting. *Compare* Stubbs Dep. 19:14–17 (stating belief that Mr. Matheney was going to comply with the officer's directions), *and* Patterson Dep. 34:24–35:4 (stating belief that Mr. Matheney was complying and ready to surrender), *with* Pilon Dep. 31:18 (describing Mr. Matheney as "aggressive" and in a "shooting stance."), *and id.* 47:20-25 (describing Mr. Matheney in a "low crouch" aiming a gun).

County Defendants emphasize that Mr. Matheney showed an "unyielding desire to get away," when he failed to stop. County Br. at 8. And State Defendants misrepresent evidence in the record, arguing that Mr. Matheney "threatened to shoot if his demands weren't met." State Br. at 10. State Defendants' assertion does not square with evidence that Patterson relayed that Mr. Matheney had threatened to shoot *himself*—not the officers. In omitting that Mr. Matheney threatened to shoot *himself*, State Defendants attempt to create the inference that Mr. Matheney *threated to shoot the officers*, which would significantly change the Court's analysis. State Defendants are admonished for this misrepresentation of fact.

The Ninth Circuit has cautioned that because "[r]esistance … should not be understood as a binary state, with resistance being either completely passive or active[, r]ather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer," and the nature of any resistance should be viewed in light of the particular facts of the case. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Here, it is disputed whether Mr. Matheney actively resisted arrest. Some officers observed that he was complying, and other observations were to the contrary. Therefore, this factor does not provide much weight in favor of the governmental interest in using deadly force.

### iv.    Availability of Alternative Methods of Arrest

Plaintiffs assert that Defendants failed to give warnings that deadly force would be used before the first and second round of gunfire. Plf. Br. at 11, 23–24. Further, that there were less intrusive means to get Mr. Matheney to surrender. *Id.*

Plaintiffs point to Patterson's attempt to coax Mr. Matheney out for a cigarette, and that it appeared to Patterson that he was about to give up. *Id*. at 24. Plaintiffs contend that it was feasible to issue a warning before using lethal force, because officers were issuing other warnings to Mr. Matheney and communicating successfully with one another. Plf. Br. at 18. Plaintiffs note that officers were captured on audio from Patterson's dashcam saying: "Still moving," "Show hands," "He's moving," and "Watch out" prior to firing shots. Pilon Dashcam at 10:53:10–10:53:25. Based on that, Plaintiffs contend that Defendants could have similarly signaled to Mr. Matheney that deadly force would ensue. *Id*.

Defendants do not specifically address Plaintiffs' failure to warn theory, but there is evidence in the record that Hill, at one point, did say he would shoot Mr. Matheney if he did not come out of the car and put his hands in the air. Hill Dep. 22:6–21. Hill described in his deposition the time between when the car door opened and his decision to fire on Mr. Matheney was "like a second," and that "it was as fast as [he] could." *Id*. at 29:3–12. Further, that it "was far too fast to make a command" to Mr. Matheney to drop the gun or put his hands up. *Id*. at 34:1–15. As Plaintiffs point out, however, Patterson seemed confident he could get Mr. Matheney to come out and negotiate over the prospect of a cigarette. Patterson Dep. 36:7–15.

Accordingly, based on evidence that Mr. Matheney's actions were too sudden to allow time for commands, it is not clear whether giving a warning was "feasible" under the totality of the circumstances. The officers who shot Mr. Matheney perceived him as an *immediate* threat—and whether Mr. Matheney was such a threat is a

material fact in dispute that creates a genuine issue for trial. The Court therefore finds that this element constitutes a neutral consideration in evaluating government interest in the use of lethal force against Mr. Matheney.

### 3. Balancing *Graham* Factors

Whether the use of force was "objectively reasonable" in light of the facts and all the relevant circumstances confronting State and County Defendants is a question for the jury. *Graham*, 490 U.S. at 397. The "government interest" factors analyzed above involve objective evidence from the record that is highly contradictory. Considering the severity and extent of the force used, the three basic *Graham* factors, and the availability of other means of accomplishing the arrest, it is evident that the question whether the force used was reasonable is a matter that cannot be resolved in favor of State or County Defendants on summary judgment. Therefore, the Motions for Summary Judgment on Plaintiffs' excessive force claim are DENIED as to Pilon, Hill, Stubbs, Maganzini, and Havel. Because Patterson and Kintzley did not deploy any force against Mr. Matheney, the Court will analyze their motions under the "integral participant" doctrine.

## III. Excessive Force, Integral Participant and Failure to Intervene—Fourth Amendment (42 U.S.C. § 1983)

Plaintiffs allege that Defendants are liable for Mr. Matheney's injuries, "either because they were integral participants in the use of excessive force, and/or because they failed to intervene to prevent these violations." Compl. ¶¶ 45, 53. This theory would apply to Patterson and Kintzley, who did not fire their weapons.

A.    Legal Framework: "Integral Participant" and "Failure to Intervene"

In the Ninth Circuit, an official whose "individual actions" do "not themselves rise to the level of a constitutional violation" may be held liable under section 1983 only if the official is an "integral participant" in the unlawful act. *Peck v. Montoya*, 51 F.4th 877, 888–89 (9th Cir. 2022). An officer is an integral participant only if they (1) knew about and acquiesced in the unconstitutional conduct as part of a common plan with those whose conduct violated the Constitution, or (2) they set in motion a series of acts by others which they knew or reasonably should have known would cause others to violate the Constitution. *Id.* at 889.

Officers can be held liable for failing to intervene in situations where excessive force is claimed to be employed by other officers, only if "they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000) (finding a failure to intervene claim failed because there was no realistic opportunity for officers to prevent a rapidly unfolding shooting). In *Hughes v. Rodriguez*, the court held that officers could not be held liable for fleeting acts which they did not commit, came without warning, and could not have prevented. 31 F.4th 1211, 1223 (9th Cir. 2022). In determining whether officers have a realistic opportunity to intervene, courts consider a variety of factors including the length of time that transpired during the event, the physical locations of the parties involved and the distances between them, and whether the allegedly unconstitutional act could have been anticipated by the other officers. *Perkins v. City of Modesto*, 2023 WL 3620901*10 (E.D. Cal. 2023); *see*

*also Cortesluna v. Leon*, 979 F.3d 645, 656 (9th Cir. 2020), *rev'd on other grounds by Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021).

    B.    Deputy Kintzley: Integral Participant/Failure to Intervene

Defendant Kintzley moves for summary judgment on Plaintiffs' excessive force claim, asserting that he did not shoot his gun, and cannot be held liable for use of excessive force because he neither "integrally participated" in the alleged constitutional violation nor had a "realistic opportunity to intervene." Kintzley Br. at 10. First, he points to evidence in the record is that there was no tactical plan, thus the alleged unconstitutional conduct—the shooting of Mr. Matheney—was not part of a "common plan" to use excessive force. Havel Dep. 65:18–21; Maganzini Dep. 31:24–32:1.

In *Peck v. Montoya*, the Ninth Circuit held that three non-shooting officers were not integral participants in an unconstitutional shooting because the shooting was unplanned and there was no evidence that the officers "formed a plan whereby [the shooting officers] would deploy excessive force." 51 F.4th at 891.

The facts of this case are similar to those in *Peck*, where five officers responded to a 9-1-1 call about a suspect waiving around a gun and threatening to shoot people. *Id.* at 883. Four of the officers took positions on one side of the house, while the fifth officer took a position on the other side. *Id.* The suspect was visibly agitated, taunted the officers, and threatened to shoot them if they entered his house. *Id.* One of the officers saw a holstered gun near the suspect and alerted the other officers, then believed he saw the suspect grab the gun. *Id.* at 884. At that moment, two of the

officers independently fired unaware that the other was also shooting. *Id.* The three remaining officers did not shoot. *Id.*

The court determined that the non-shooting officers were not integral participants because the shooting itself was completely unplanned and there was no evidence of a plan to use excessive force. *Id.* at 891. The Ninth Circuit considered the potential that it was foreseeable a shooting may take place because the officers responded to a call about someone with a weapon behaving erratically. *Id.* The court nonetheless determined there was no reason for the officers "to know that an *unconstitutional* shooting would take place." *Id.* (emphasis in original).

Kintzley points to evidence in the record that the only planned conduct by any Defendants involved road spikes and the use of the PIT maneuver. Campbell Decl., ECF No. 52-9, Ex. 19 at 4; *id.*, ECF No. 51-10, Ex. 10 at 4. Further, that after Mr. Matheney was stopped, the officers tried to get Mr. Matheney out of the car to surrender, and some officers believed Mr. Matheney was going to surrender up until the shooting started. *Id.*, Ex. 19 at 7; *id.*, Ex. 9 at 2. Plaintiffs do not rebut this evidence.

Second, Kintzley argues that he "did not set in motion a series of acts by others that he knew or should have known would cause them to violate Mr. Matheney's constitutional rights." Kintzley Br. at 12. Evidence in the record is in accord with Kintzley's assertion. He moved in to render aid, believing that Mr. Matheney was incapacitated and had no reason to know the other officers would begin shooting again. That officers in the north shot at Mr. Matheney a second time to protect

Kintzley does not necessitate the conclusion that Kintzley should have known they would do so. Evidence in the record is that Kintzley did not direct his fellow officers to shoot Mr. Matheney, nor did he take any actions that facilitated the other officers' allegedly unconstitutional acts.

As to Plaintiffs' "failure to intervene" theory, Kintzley asserts that his motion for summary judgment should be granted because he did not have a realistic opportunity to intervene when officers shot Mr. Matheney. Kintzley Br. at 13.

Kintzley points to evidence that the shootings occurred quickly, that he had no reason to anticipate the other officers would begin shooting, and he was a significant distance from the officers who were shooting. *See* Patterson Dep. 16:2–4. Kintzley maintains that he could only see the top of Mr. Matheney's head. Campbell Decl., ECF No. 52-2, Ex. 12 at 15. Because of the different perspectives between the officers in the north and Kintzley to the south, Deputy Kintzley did not see the actions of Mr. Matheney that the other officers saw and asserts he could not have anticipated that the other officers would begin shooting.

Courts have held that accidentally causing force does not suffice to sustain a §1983 claim. *Torres v. Madrid*, 592 U.S. 306, 317 (2021) ("[a]ccidental force will not qualify") (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)). Plaintiffs have not rebutted Kintzley's evidence and argument. Even when the facts are viewed in the light most favorable to Plaintiffs, there is not a genuine issue for trial. Accordingly, Defendant Kintzley's motion is GRANTED on Plaintiffs' integral participant / failure to intervene theory.

C.    Deputy Patterson: Integral Participant/Failure to Intervene

In moving for summary judgment, Patterson does not provide any argument or evidence rebutting that he was an integral participant or that he failed to intervene. County Br. at 18. Plaintiffs respond that Patterson radioed to all officers that Mr. Matheney had a gun in his hands at one point, but that he did not relay whether the gun was still in his hands when the two were conversing. Plf. Br. at 25. Plaintiffs argue that Patterson reasonably should have known that the other officers would believe they were reasonably permitted to use deadly force based on Patterson's statement that Mr. Matheney was holding a weapon. *Id*. To that, Patterson did not respond.

The moving party bears the initial burden of informing the Court of the basis for its motion. *Celotex*, 477 U.S. at 323. That burden involves identifying portions of the pleadings and evidence demonstrating the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. Patterson has not met that burden. Further, the Court also considers argument about Plaintiffs' "integral participant" or "failure to intervene" theories waived. *See United States v. Graft*, 610 F.3d 1148, 116 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to the case authority are generally deemed waived."). Defendants' motion is denied as to Plaintiffs' integral participant and/or failure to intervene theory concerning Patterson.

IV.    Fourteenth Amendment Due Process

Under the Fourteenth Amendment, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child. *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991). This substantive due process right may be asserted by both the parents and children of a person killed by law enforcement. Mr. Matheney's five children are Plaintiffs in this case. Compl. ¶¶ 7–11.

A claim asserting that police officers violated the liberty interest Fourteenth Amendment must show that the officers' conduct "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). There are two tests used to decide whether officers' conduct "shocks the conscience." Courts decide which test to apply by "ask[ing] 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (second alteration in original) (quoting *Porter*, 546 F.3d at 1137). The two tests are the "deliberate indifference" test and the "purpose-to-harm" test.

The "deliberate indifference" test is the less demanding of the two and applies if the situation at issue "evolve[d] in a time frame that permits the officer to deliberate before acting." *Porter*, 546 F.3d at 1137. Deliberation is not possible if the officers "encounter[ed] fast paced circumstances presenting competing public safety

obligations." *Id.* at 1139. Deliberation in this context "should not be interpreted in the narrow, technical sense." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

On the other hand, the "purpose-to-harm" test applies if the situation at issue "escalate[d] so quickly that the officer [had to] make a snap judgment." *Porter*, 546 F.3d at 1137. This test requires "a more demanding showing that [the officers] acted with a purpose to harm [the decedent] for reasons unrelated to legitimate law enforcement objectives." *Id.* Legitimate objectives can include "arrest, self-protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018). Illegitimate objectives include "when the officer 'had any ulterior motives for using force against' the suspect, such as 'to bully a suspect or 'get even,'" or when an officer uses force against a clearly harmless or subdued suspect." *Id.* (citations omitted) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014)).

Whether evaluated under the deliberate-indifference test or the purpose-to-harm test, the Fourteenth Amendment "shocks the conscience" standard is distinct from the standard in Fourth Amendment excessive force claims. As described above, that standard asks whether the officers' conduct was "objectively unreasonable." *Graham,* 490 U.S. at 397. To succeed on a Fourteenth Amendment substantive due process claim requires more. *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). Because of the "more demanding standard," it is possible to succeed on a Fourth Amendment excessive force claim and fail on a Fourteenth Amendment claim based on the same facts. *See Ochoa,* 26 F.4th at 1057.

A.     Defendant Kintzley

Kintzley argues that under either standard, he took no actions that would "shock the conscience." Kintzley Br. at 17. He points to evidence that he did not engage in any use of force and that he attempted to render aid. *Id*. Plaintiffs do not rebut the evidence, and Kintzley has met the burden to prevail on summary judgment. Kintzley's motion is therefore granted.

B.    State Defendants

As discussed, State Defendants fail to develop any argument about Plaintiffs' Fourteenth Amendment substantive due process claim. In their conclusion, however, they ask the Court to dismiss it. State Br. at 17. State Defendants fail to meet the burden necessary to prevail on summary judgment. *Celotex*, 477 U.S. at 323. Further, the mere request to dismiss a claim, without more, is insufficient to form any basis for granting summary judgment. State Defendants' motion is therefore denied on this claim.

C.    County Defendants

County Defendants assert that the "purpose to harm" standard applies because Mr. Matheney was "threatening the use of a high-powered weapon," had ignored orders, and "rapidly approached officers" with an apparent intent to harm them. County Br. at 11–12. In County Defendants' view, the "deliberate indifference" standard is less applicable, because "actual deliberation" was not practical, when officers did not have time to make unhurried judgments.

In response, Plaintiffs point to the evidence that officers shot their first volley at Mr. Matheney while he was "not engaged in any threatening or menacing behavior

as he was standing up and getting out of the car, facing away from the officers, and importantly, unarmed." Plf. Br. at 27. In Plaintiffs' view, the officers had "actual time to deliberate" before shooting Mr. Matheney the first time, and again, had time to deliberate before the second round of shooting when Mr. Matheney was on the ground. *Id.* Plaintiffs also assert that Defendants are liable under the "purpose to harm" test, maintaining that a reasonable jury could find that test satisfied because Mr. Matheney's gunshot wounds are inconsistent with officer's testimony that he was facing them in a crouched position. *Id.* at 28. Rather, from Plaintiffs' view, Mr. Matheney was surrendering and unarmed. *Id.* Moreover, other officers on the scene stated that they were "shocked" by the shooting, and that Hill, Stubbs, and Maganzini collectively shot near 40 times at Mr. Matheney. *Id.*

Here, there is evidence to support both standards, and the determination should be left to the jury. *See Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) (finding same). To be sure, there is evidence in the record that the officers reasonably perceived that Mr. Matheney posed a threat requiring rapid decision making, given Patterson's warning that he had a rifle in his hands. And, as County Defendants stated in their depositions, Mr. Matheney moved aggressively toward them, which would justify application of the "purpose to harm" standard. But the question on summary judgment, however, is not whether some version of the facts supports one position, but rather whether a trier of fact, viewing the evidence in the light most favorable to Plaintiffs, must find in County Defendants' favor. According to the applicable legal standard, the Court cannot say a reasonable juror would find

for County Defendants as a matter of law. County Defendants' motion for summary judgment is therefore denied on this claim.

## V.    Qualified Immunity

Even if an officer's conduct is objectively unreasonable, "'[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)). "Once a defendant has raised qualified immunity as a defense to a claim, a plaintiff must show (1) that the right was violated; and (2) that the right was clearly established at the time of the alleged misconduct." *Id.* (citation and internal quotation marks omitted).

Already noted, State Defendants failed to provide argument about the application of qualified immunity. State Defendants' lone mention of "qualified immunity" appears at the introduction to their motion for summary judgment, previewing that their motion is "base[d] on … qualified immunity." State Br. at 2. Plaintiffs point out the absence of any qualified immunity argument. Plf. Br. at 29. In reply, State Defendants do not address the total failure to raise a qualified immunity argument. *See* ECF Nos. 70, 71 ("State Reply").

Lake County Defendants assert that, based on the facts of this case, Plaintiffs cannot demonstrate—beyond a high level of generality—that there is a similar case that would place County Defendants on notice that their conduct would violate Mr. Matheney's constitutional rights. County Br. at 18. County Defendants rely on

evidence discussed above, such as their knowledge that Mr. Matheney had a weapon, had committed a crime with that weapon, attempted to evade them in his car, threatened to shoot himself, and the disputed officer deposition testimony that Mr. Matheney exited the vehicle in "an aggressive manner toward the deputies and troopers." County Br. at 17–18.

Here, there is a material factual dispute about whether Mr. Matheney was holding a rifle pointed at the officers at the time of the shooting, thereby posing an immediate threat. This genuine dispute forecloses the grant of qualified immunity at the summary judgment stage. As discussed above, if Mr. Matheney was unarmed and facing away when he was shot in the back, the jury could find that the involved Defendants violated Mr. Matheney's constitutional rights. And it is clearly established beyond debate that an officer may not shoot a non-threatening person. *See, e.g., Garner*, 471 U.S. at 11-12.

Further, as Plaintiffs point out, there are cases with similar fact patterns that go beyond broad generalities. Plf. Br. at 29–31. Even when individuals were armed with a firearm, courts have found the question of whether the weapon was pointed in a way that posed a threat was sufficient to defeat summary judgment. *See Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017) (if the decedent did not point the gun at the officers and "was not facing them when they shot him for the first time," or the second and third time, a jury could reasonably conclude that the use of deadly force was not reasonable); *Curnow ex rel. Curnow v. Ridgecrest Police Dep't*, 952 F.2d 321, 325 (9th Cir. 1991) (rejecting summary judgment where the suspect

had a gun, but was not pointing it at the officers and was not facing the officer who opened fire); *Longoria v. Pinal County*, 873 F.3d 699, 706-07 (9th Cir. 2017) (dispute of fact regarding whether suspect assumed a threatening "shooter's stance" in interaction with officers precluded summary judgment).

Because of the many material, disputed facts in this case, the involved Defendants' credibility or the accuracy of their versions of the facts is a central question that must be answered by a jury. The Court cannot decide as a matter of law that qualified immunity is appropriate at this juncture. *See Longoria,* 873 F.3d at 705 (similarly stating).

VI.    State Law Claims

Plaintiffs allege claims for wrongful death arising from Defendant officers' negligence and battery under Oregon law, citing ORS 30.265(1), which is part of the Oregon Tort Claims Act ("OTCA"). Plaintiffs allege that the State of Oregon and Lake County are liable for the actions of Patterson, Kintzley, Havel, Maganzini, Pilon, and Hill, who were "acting within the scope of their employment or duties." Sec. Am. Comp. ¶¶ 30, 128, 129, 136, 137.

The Eleventh Amendment grants states "immunity from federal court suits brought by its own citizens as well as by citizens of another state." *Riggle v. State of Cal.,* 577 F.2d 579, 581 (9th Cir. 1978). Under the Eleventh Amendment, a state and state agencies are "immune from suit under state or federal law by private parties in federal court absent a valid abrogation of that immunity or an express waiver by the state." *In re Harleston*, 331 F.3d 699 (9th Cir.2003).

The Oregon Constitution protects the state, including its political subdivisions, from suit, unless the legislature provides a cause of action. *Dowers Farms v. Lake Cnty.,* 288 Or. 669, 679 (1980) (citations omitted). The Oregon legislature enacted the OTCA to "abrogat[e], in part, the state's sovereign immunity." *Jensen v. Whitlow,* 334 Or. 412, 416, 51 P.3d 599 (2002); *Rabkin v. Or. Health Sci. Univ.,* 350 F.3d 967, 974 (9th Cir.2003) (citations omitted). Under the OTCA, "every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties." ORS § 30.265(1).

The OTCA is a waiver of sovereign immunity but does not waive Eleventh Amendment immunity. Thus, suits by private parties against the state must be brought in state court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99 n. 9 (1984); *Est. of Pond v. Oregon,* 322 F. Supp. 2d 1161, 1165 (D. Or. 2004); *Webber v. First Student, Inc.,* 928 F. Supp. 2d 1244, 1269 (D. Or. 2013)

A.    State Defendants: State Law Claims

State Defendants argue that the OTCA substitutes the State of Oregon as the proper Defendant, and that the Eleventh Amendment subsequently bars Plaintiffs' claims against the State of Oregon in federal court. State Def. Br. at 13–16.

When suing state officers, employees, and agents for their work-related torts, the OTCA substitutes the "claim against the public body[.]" *Jensen v. Whitlow,* 334 Or. 412, 51 (Or. 2002); ORS § 30.265(3) ("the sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties ... is an action against the public body"). Thus, to proceed

against Defendants Pilon and Hill, Plaintiffs are required to substitute the State of Oregon for the individual State Defendants. *See Ctr. for Legal Studies, Inc. v. Lindley,* 64 F.Supp.2d 970, 974 (D.Or.1999), *aff'd,* 1 F.App'x 662 (9th Cir.2001) (substituting public body for individual defendants). Thus, as a matter of law, State Defendants have demonstrated that Plaintiffs' suit against the state must be brought in state court and summary judgment is granted to State Defendants on Plaintiffs' state law claims.

    B.    County Defendants: State Law Claims

Protection from suit under the Eleventh Amendment "does not extend to counties and municipal corporations. *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1180 (9th Cir. 2003). To institute an action under the OTCA, notice of a claim must be given to a public body "within one year after the alleged loss or injury." ORS § 30.275(2)(a). "The purpose of the notice requirement [is] to allow the public body an opportunity to investigate a matter promptly and to settle all meritorious claims without litigation." *Flug v. Univ. of Or.,* 170 Or. App. 660, 671, 13 P.3d 544 (2000), *aff'd,* 335 Or. 540, 73 P.3d 917 (2003) (citation omitted). Plaintiffs allege that on December 28, 2021, they filed "comprehensive and timely claims for damages" with County Defendants, "according to applicable sections of the Oregon Revised Statute." *Id*. ¶¶ 32, 33.

Also, as to Plaintiffs' battery claim, County Defendants assert that they were entitled to use deadly physical force necessary to: (1) make an arrest when probable cause exists to believe the person has committed a felony; (2) defend from imminent

threat of death or serious injury; and (3) prevent escape from custody. County Def. Br. at 19 (citing ORS 161.242(1)). County Defendants assert that an officer who makes an arrest is "presumed" to be acting in good faith in determining the amount of force necessary. *Id.* (citing *Rich v. Cooper*, 234 Or. 300, 311, 380 P.2d 613 (1963)). According to the County, Plaintiffs must "overcome [that] presumption" to avoid summary judgment.

For reasons discussed above, Plaintiffs have overcome that presumption. That is, because there is a genuine dispute of material fact about whether County Defendants used excessive force under the Fourth Amendment, and those same facts are at issue in determining whether County Defendants are liable for civil battery, summary judgment is precluded. The Oregon Court of Appeals cited *Rich v. Cooper*, and explained that even if "a police officer is presumed to be acting in good faith in determining the amount of force necessary to make the arrest[,] the use of excessive force by a police officer in carrying out an arrest can give rise to civil liability for battery." *Ballard v. City of Albany*, 221 Or. App. 630, 641, 191 (2008). The appellate court stated that, in cases of excessive force, whether a battery occurred "is for the jury to decide. *Id.* at 643. County Defendants' motion for summary judgment is denied as to Plaintiffs' battery claim under Oregon law.

County Defendants do not address Plaintiffs' negligence claim and therefore County Defendants are not entitled to summary judgment on Plaintiffs' negligence claim. *Celotex*, 477 U.S. at 323.

C.    Deputy Kintzley: State Law Claims

In Oregon, a plaintiff may recover under either negligence or intentional conduct when the evidence supports both theories, and both are properly pled. *Kaady v. City of Sandy*, No. CV. 06-1269-PK, 2008 WL 5111101, at *26 (D. Or. Nov. 26, 2008). A plaintiff suing for negligence must prove all of the following: (1) that defendant's conduct caused a foreseeable risk of harm; (2) that the risk is to an interest of a kind that the law protects against negligent invasion; (3) that the defendant's conduct was unreasonable in light of the risk; (4) that the conduct was the cause of plaintiff's harm; and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent. *Son v. Ashland Community Healthcare Services*, 239 Or. App. 495, 506 (2010). To satisfy the first element, a plaintiff's complaint must allege that the defendant had "some responsible involvement" with the event "to be found negligent for its occurrence." *Fortney v. Crawford Door Sales Corp.*, 97 Or. App. 276, 280 (1989).

Plaintiffs maintain that Kintzley was negligent in leaving cover without communicating to the officers that he was approaching to render aid. Plf. Br. at 37. Further, that Havel, Stubbs, and Hill all testified that they only shot to protect Kintzley, and that Hill testified that if Kintzley had not left cover, he would not have fired additional shots. *Id.*

Kintzley asserts that his conduct did not create a "reasonably foreseeable risk of harm," which is a required element of negligence under Oregon law. Kintzley Reply at 9. Kintzley argues that harm is foreseeable if "a reasonable person considering the

Page 49 – OPINION & ORDER

potential harms that might result from his or her conduct would have reasonably expected the injury to occur." *Id*. (citing *F.T. v. West Linn-Wilsonville Sch. Dist.*, 318 Or. App. 692, 702 (2022)). In Kintzley's view, that the other officers would begin shooting again was not foreseeable to anyone. Kintzley points to evidence that all officers heard Patterson say that the "suspect [was] down," and that he and Patterson were shocked by both rounds of gunfire. Kintzley Br. at 7 (citing Campbell Decl., Ex. 19 at 7).

The Court finds that, as a matter of law, Kintzley has met his burden on summary judgment to show that his conduct—to move in to render aid—did not cause a foreseeable risk of harm. *Son*, 239 Or. App. at 506. Plaintiffs have not rebutted Kintzley's evidence. *Liberty Lobby, Inc.*, 477 U.S. at 250.

## CONCLUSION

For the reasons explained, State Defendants' Motion for Summary Judgment, ECF No. 55, is GRANTED in part and DENIED in part: DENIED as to Plaintiffs' claim for excessive force and substantive due process, and as to its qualified immunity defense. State Defendants' Motion for Summary Judgment is GRANTED on Plaintiffs' state law claims and applicable voluntarily ceded claims.

Lake County Defendants Motion for Summary Judgment, ECF No. 53, is GRANTED in part and DENIED in part: DENIED as to Plaintiffs' claim for excessive force; substantive due process; and state law claims. Lake County Defendants' motion is GRANTED on Plaintiffs' applicable voluntarily ceded claims.

Deputy Kintzley's Motion for Summary Judgment, ECF Nos. 49 and 50, is GRANTED and Deputy Kintzley is DISMISSED from this case.

It is so ORDERED and DATED this  14th  day of November 2025.


                                        /s/Ann Aiken
                                        ANN AIKEN
                                        United States District Judge